# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DAKOTA DEL CASTILLO, | : | Case No. 3:16-cv-441 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| CHIPOTLE MEXICAN GRILL, INC., | : | |
| | : | |
| Defendant. | : | |

---

## ENTRY AND ORDER DENYING DEFENDANT CHIPOTLE MEXICAN GRILL, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. 16)

---

This employment discrimination case is before the Court on the Motion for Summary Judgment (Doc. 16) filed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle"). Plaintiff Dakota del Castillo ("del Castillo") alleges that Chipotle terminated his employment because of his race in violation of Title VII of the Civil Rights Act of 1964 and the Ohio Revised Code, Ch. 4112. (Doc. 1 at ¶ 31-33.) Chipotle argues that it is entitled to summary judgment because del Castillo cannot establish a prima facie case or that Chipotle's reason for firing him—that he violated its absenteeism policy—was pretext for unlawful discrimination. In opposition, del Castillo argues that he has produced evidence sufficient to create genuine issues of material fact as to all elements for which he carries the burden. (Doc. 17.) Chipotle having replied to del Castillo's memorandum, this matter is ripe for review. (Doc. 18.) For the reasons below, the Court denies Chipotle's Motion for Summary Judgment.

## I. BACKGROUND

### A. Chipotle's Organization and Management Structure

Chipotle is a chain of "fast casual" restaurants that specializes in Mexican fare and operates

a restaurant in Huber Heights, Ohio. (Doc. 16-1, McGee Dec., at ¶ 4.) Chipotle's restaurants are staffed by Crew Members who are responsible for preparing and cooking ingredients, assembling customer food orders, cleaning and maintaining the restaurant, delivering customer service and other similar tasks. (*Id*. at ¶ 5.) The Crew Members are managed by four levels of management (listed in ascending order of responsibility): Kitchen Manager, Service Manager, Apprentice Manager, and General Manager. (*Id.* at ¶ 6.) At the time of del Castillo's termination, Christian Moler was the General Manager, Lacey Bundy and Phillip Stamas were Apprentice Managers, Travion Ramey was a Service Manager, and Madison Sees and Brandon Martin were Kitchen Managers. (*Id.* at ¶ 7.)

Above General Managers, Chipotle employs Team Leaders, who are responsible for multiple restaurants in a geographic region. (*Id.* at ¶ 8.) At the time of del Castillo's termination, Michael McGee was the Team Leader for the Huber Heights location. (Doc. 16-3, del Castillo dep., at 145:22 – 147:9; Doc. 16-1, McGee dec., at ¶ 3.)

**B. Chipotle's Anti-discrimination Policies**

Chipotle maintains and regularly updates an Equal Employment Opportunity (EEO) policy, Code of Conduct, and Anti-Discrimination, Harassment, and Sexual Harassment policy, which Chipotle refers to collectively as its "Respectful Workplace Policy." (Doc. 16-1, McGee dec., at ¶ 9.) Every new hire has access to this handbook and a copy is kept in the office of each Chipotle location. (Doc. 16-2, 2014 Crew Handbook, at 9.) In addition, Chipotle posts a Respectful Workplace Poster on the employee bulletin board at each location. (Doc. 16-1, McGee dec., at ¶ 9.) To encourage employees to report any inappropriate behavior, including discriminatory and/or harassing behavior, Chipotle provides two avenues for reporting

anonymously—the Respectful Workplace Hotline and Chipotle Confidential. (*Id.* at ¶ 10.) An employee can also report any inappropriate behavior to their manager or any field level manager. (*Id.*) Del Castillo was aware of and understood Chipotle's Respectful Workplace Policy and the available avenues for reporting discriminatory behavior. (Doc. 16-3, del Castillo dep., at 64:3-7, 148:7-149:1, 227:8-228:4.)

### C. Kitchen Manager Training and Promotions

To be eligible for promotion to Kitchen Manager a crew member must complete the Kitchen Manager in Training book and must have the support of the entire store. (Doc. 16-5, McGee dep., at 45:21-49:20.) Once training is completed and support secured, the General Manager will sign off, verifying readiness for promotion. (*Id.*) Then, the Field Leader will validate the training and promote to Kitchen Manager. (*Id.*) A Kitchen Manager in Training "is responsible for their own development," meaning one must take the initiative to ensure that one completes his/her training. (*Id.* at 88:4-19.) Promotions are not determined by one person, rather, every person in the store from crew members to field leaders has a say. (Doc. 16-11, Moler dep., at 45:17-19.)

### D. Chipotle's Attendance Policy

Chipotle's attendance policy is stated in its Crew Handbook and states in relevant part:

If you unexpectedly have to miss work or arrive late for any reason, call the manager in charge.

If you are absent from work for two consecutive scheduled shifts without notifying Chipotle, you will be considered to have voluntarily resigned from employment. . . .
Coming in late for work is not acceptable. Lateness may be cause for disciplinary action up to and including termination.

(Doc. 16-2, 2014 Crew Handbook, at 11.)

If employees miss a shift, they are required to inform their manager at least two hours before missing their shift so there is time to find a replacement. (Doc. 16-11, Moler dep., at 148:11-17; 159:1.) Moler articulated this requirement to everyone at the Huber Heights location. (*Id.* at 158:22-159-15.)

**E. Del Castillo's Race and National Origin**

Del Castillo testified that he is one-half Hispanic, one-quarter African-American, and one-quarter Caucasian. (Doc. 16-2, del Castillo dep., at 15:7-12.) When people ask him about his race and/or national origin, however, del Castillo identifies as "American." (*Id.* at 14:20-21; 15:2-6 ("my immediate answer's always America"); 15:14-16 ("America. That's what I say."); 17:2-3 ("I'm American").) Del Castillo has formally identified as white on some occasions, but has never formally identified as African-American or Hispanic. (*Id.* at 15:22-16:10.) For example, in his medical records, del Castillo identified his race as "White or Caucasian" and identified his ethnicity as "Non-Hispanic." (Doc. 16-7.)

Del Castillo is Plaintiff's legal last name, and is what is on his birth certificate and driver's license. (Doc. 17-1, del Castillo dec., at ¶ 3; Doc. 16-3, del Castillo dep., at 7:22-8:4.) It is undisputed that he identified himself as Dakota del Castillo at Chipotle and "Dakota del Castillo" is what was written on the work schedule. (Doc. 17-2; Doc. 16-10, McCoy dep., at 33:12-17.) Growing up, del Castillo used his stepfather's last name, Evers. (Doc. 16-3, del Castillo dep., at 7:8-21.) Del Castillo's Facebook name is "Dakota Anderson." (*Id.* at 230:24-25.) Anderson is his maternal grandfather's last name. (*Id.* at 231:3-5.)

Del Castillo was born in California and has lived in only California and Ohio. (*Id.* at 8:9-18.) His mother was born in Toledo, Ohio, and is half Danish and half African-American.

(*Id.* at 10:8-12.)   Del Castillo is not in contact with his biological father.   (*Id.* at 9:25-10:2.)   He

testified that his biological father is Hispanic and grew up in Orange County, California.   (*Id.* at

10:3-16.)   Del Castillo's adopted grandmother has told him that both his paternal biological

grandparents are Hispanic.   (Doc. 17-1, del Castillo dec., at ¶ 2).[1]

### F.   Del Castillo's Employment at Chipotle

Del Castillo began working at Huber Heights in May 2013 as a crew member.   (Doc. 17-3,

del Castillo dep., at 33:12).   Diana Bowling was the General Manager at Huber Heights when del

Castillo started.   (*Id.* at 35:3-7.)   Christian Moler took over the Huber Heights location as the

general manager on or around June 2014.   (Doc. 16-1, McGee dec., at ¶ 16.)

Del Castillo alleges that when he first met Moler, Moler asked "so what are you, Dakota,"

referring to his racial or national origin.   (Doc. 16-3, del Castillo dep., at 98:20-99:4.)   Del

Castillo testified that Moler asked him similar questions a few to a half dozen times during his

employment at Chipotle.   (*Id.* at 98-19-23.)   Moler denies asking del Castillo about his race or

national origin.   (Doc. 16-11, Moler dep., at 80:17-18.)   Regardless, del Castillo testified that he

always told Moler that he was "American."   (Doc. 16-3, del Castillo dep., at 100:5-10.)

Moler testified that he thought del Castillo was Caucasian and did not know that he claimed

to be Hispanic until this lawsuit.   (Doc. 16-11, Moler dep., at 155:3-15.)   Moler also testified that

he did not think the name "del Castillo" sounded Hispanic.   (*Id.* at 144-45.)   Del Castillo alleges

that Moler overheard him tell another coworker that he was part Hispanic.   (Doc. 16-3, del

Castillo dep., at 100:7-102:12.)   Moler denies that he heard this conversation.   (Doc. 16-11,

---

[1] Chipotle cited testimony from del Castillo's former girlfriend, Jaymee Owens, who met both of his biological parents.   (Doc. 16-4, Owens dep., at 9-12.)   Del Castillo objected on hearsay grounds to Owens' testimony regarding what del Castillo's father allegedly told her about his race and nationality.   Del Castillo's objection is well-founded; the Court therefore has not considered this testimony.

Moler dep., at 143:8-19.)

Del Castillo first started Kitchen Manager training under Bowling. (Doc. 16-3, del Castillo dep., at 41:6-14.) On several occasions, when McGee visited the store he asked del Castillo if he was ready to be promoted to Kitchen Manager. (*Id.* at 58:22-61:6.) Each time, del Castillo responded that he was ready to be promoted, but Bowling said that del Castillo was still learning. (*Id.*) Even though del Castillo claims he completed his Kitchen Manager in Training Guide two months before Bowling was terminated, Bowling did not promote del Castillo. (*Id.*) Instead, she promoted Scott Johnson (Caucasian) and Travion Ramey (Black) to Kitchen Manager. (*Id.* at 62:3-10.)

When Moler became the General Manager, del Castillo restarted his Kitchen Manager in Training book. (*Id.* at 78:20-25.) Del Castillo never completed his Kitchen Manager in Training book under Moler and as a result was ineligible for promotion. (Doc. 16-11, Moler Dep., at 108:11-15; Doc. 16-5, McGee Dep., at 75:23-25.)

Del Castillo was also ineligible for promotion because his team did not support him for promotion. Moler explained to del Castillo that the team did not support his promotion because they did not like how del Castillo spoke to them. (Doc. 16-11, Moler dep., at 108:8-109:5; Doc. 16-3, del Castillo dep., at 49:11-24.) During depositions, many witnesses corroborated Moler's reasoning. (Doc. 16-3, del Castillo dep., at 53:13-24) (admitting that he spoke to at least one coworker who confirmed Moler's explanation); (Doc. 16-4, Owens dep., at 36:15-37:4) (". . . if he went to critique somebody, he wouldn't say it in a nice, like, helping manner . . . I saw it rude, . . . that's not how you help somebody"); (Doc. 16-5, McGee dep., at 80:7-9) ("[t]he crew is starting to be weary of [del Castillo] because he's giving them attitude and being rude to them"); (Doc. 16-6,

Rivera dep., at 24:22-25:2; 30:17-24; 31:20-25 ("He just wasn't a nice guy. He made everybody feel stupid with the things he would say."); (Doc. 16-8, Curtis dep., 28:20-29:12) (describing del Castillo as cocky and condescending); (Doc. 16-9, Sees dep., at 62:21-63:8) ("He was just a rude, arrogant person. He was not a friendly person in that restaurant. Not a likable person. Not somebody I'd be willing to work under or have as my manager.").

### G. Del Castillo's Termination

On August 25, 2014, del Castillo was scheduled to work two shifts from 11:45 a.m. to 3:45 p.m. and 5:00 p.m. to 9:30 p.m. (Doc. 16-3, del Castillo dep., at 122:13-125:3.) Del Castillo admits that he was late for his first shift. (*Id.* at 123:15-23.) Del Castillo testified that he told Moler that he was not feeling well a few times, but Moler did not recall del Castillo telling him that. (*Id.* at 124:2-25; Doc. 16-11, Moler dep., at 123:2-5.)

At 4:53 p.m., seven minutes prior to the start of his second shift, del Castillo called Huber Heights and informed Bundy that he was sick and not coming to work. (Doc. 16-3, del Castillo dep., at 127:2-131:21.) Bundy told del Castillo that if he could not get his shift covered he would need a doctor's note. (*Id.* at 127:2-128:16.) Del Castillo testified that he believed, but was not 100% certain, that during this conversation Bundy was talking to Moler in the background. (*Id.* at 127:2-129:5.) Moler testified that he was never told that del Castillo was sick and would miss his shift. (Doc. 16-11, Moler dep., at 125:15-21.) Bundy also did not recall telling Moler that del Castillo was going to miss his shift. (Doc. 16-13, Bundy dep. at 47:14-17.) That night, del Castillo went to an Urgent Care facility and was diagnosed with acute bronchitis. (Doc. 16-3, del Castillo dep., at 132:9-135:13.)

The next day, August 26, 2014, even though del Castillo was scheduled to work at 3:45

p.m., he did not call to inform Chipotle that he would be absent due to illness until 5:35 p.m. (*Id.* at 138:23-140:13.) Earlier that day, del Castillo had "lingered around home" and "went to sleep." (*Id.* at 138:23-139:5.) Del Castillo asserts that Moler terminated his employment over the phone, which Moler denies. (Doc. 16-11, Moler dep., at 141:5-24.) Moler testified that he terminated del Castillo in person, after discussing whether or not to do so with Sees and possibly other managers. (*Id.* at 133:6-136:25; Doc. 16-9, Sees dep., at 65:7-19.)

Regardless, Moler discussed del Castillo's termination with other managers—either before or after he was terminated. If the discussion occurred afterwards, it was in the context of determining whether Moler should give del Castillo his job back. (Doc. 17-6, Sees dep., at 68:23-70:5.) They allegedly discussed the fact that del Castillo had no call, no showed for two shifts and Moler questioned whether he should give him another chance. (Doc. 16-9, Sees dep., at 65:7-19.) Moler had discretion in enforcing Chipotle's no show-no call policy. (Ex. 17-7, Moler dep., at 97:18-24.) Sees opined that del Castillo did not deserve another chance because, in addition to missing two consecutive shifts, he was a low performer. (Doc. 16-9, Sees dep., at 65:7-19.)

After del Castillo's phone call with Moler, del Castillo went to the store to discuss his employment. (Doc. 16-3, del Castillo dep., at 142:13-17; Doc. 16-11, Moler dep., at 137:3-7.) When he arrived, he met with Moler, Sees, and Bundy. (Doc. 16-11, Moler dep., at 137:14-22; Doc. 16-3, del Castillo dep., at 142:14-143:6.) During this meeting, Moler informed del Castillo that they were terminating him for violating the no call, no show policy. (Doc. 16-11, Moler dep., at 137:25-138:3; Doc. 16-3, del Castillo dep., at 143:4-20.) Del Castillo claims to have held up his doctor's note at this meeting, but no one else recalls this and he did not provide it or any other

paperwork to Moler, Sees or Bundy. (Doc. 16-11, Moler dep., at 138:23-139:11; Doc. 16-9, Sees dep., at 68:9-22; Doc. 16-13, Bundy dep., at 46:9-11; Doc. 16-3, del Castillo dep., at 145:5-12.) Del Castillo's doctor had written a note stating only that it was his "medical opinion" that del Castillo *could* return to work on August 26, 2014. (Doc. 16-15, Doctor's Note.) The parties dispute whether or not del Castillo told Moler that he missed his shifts because he was sick. In addition, even though del Castillo's doctor opined that he could work, Chipotle has a policy that prohibits individuals with contagious illnesses from working. (Doc. 17-8, 2014 Crew Handbook, at 14-15.)

### H.  Promotions to Kitchen Manager

Del Castillo sought a promotion to Kitchen Manager, but never received one. While a General Manager at the Huber Heights location, Moler promoted only Sees to Kitchen Manager. (Doc. 16-11, Moler dep., at 113:17-25.) Moler testified that Sees was promoted because she finished her Kitchen Manager training book and had the support of her entire team. (*Id.*) Witnesses confirmed that they supported Sees' promotion to Kitchen Manager. (Doc. 16-8, Curtis dep., at 44:12; Doc. 16-10, McCoy dep., at 40:24-41:1; Doc. 16-12, Kaur dep., at 29:4-6; Doc. 16-6, Rivera dep., at 29:12-30:1; (Doc. 16-5, McGee dep., at 85:15-23); (Doc. 16-14, Kaur dep., at 17:16-19.)

Moler testified that he also "set up" crew member Michael David Rodriguez, who is Hispanic, to be promoted to Kitchen Manager at the Huber Heights store, but ultimately he was not promoted at that location. Del Castillo alleges that Rodriguez was not promoted because he was Hispanic. (Doc. 16-3, del Castillo dep., at 166:8-15.) Moler testified that Rodriguez quit after he failed his validation test with the Field Leader. (Doc. 16-11, Moler dep., at 73:3-10.)

### I.  Moler's Alleged Racist Remarks and Claims

Del Castillo testified that Moler made several derogatory remarks about Hispanics in del Castillo's presence.   Del Castillo testified that Moler made the following joke: "why can't you play Uno with a Mexican? Because they take all the green cards."   (Doc. 16-3, del Castillo dep., at 106:21-24.)   Del Castillo admits that Moler did not direct this joke at him.   (*Id.*)   Moler denies making this joke.   (Doc. 16-11, Moler dep., at 104:22-24.)   No witness testified that they heard Moler make this joke or any other discriminatory jokes.   (Doc. 16-13, Bundy Dep., at 35:13-15.)

Del Castillo also alleges that Moler said that he "fucking hates Mexicans" and called Mexicans dirty.   (Doc. 16-3, del Castillo dep., at 116:2-117:2; 117:8-18.)   Moler denies making these statements.   (Doc. 16-11, Moler dep., at 104:13.)   No one other than del Castillo heard Moler make these statements or any other discriminatory statements.   (Doc. 16-14, Kaur dep., at 22:13; Doc. 16-8, Curtis dep., at 47:9; Doc. 16-10, McCoy dep., at 49:16; Doc. 16-9, Sees dep., at 53:4.)   Del Castillo alleges that he told his girlfriend, Owens, about Moler's statements.   (Doc. 16-3, del Castillo dep., at 118:16-17.)   Owens does not remember being told that Moler made these statements.   (Doc. 16-14, Owens dep., at 40:3-5.)   Another co-worker, Mari Rivera, testified that del Castillo never told her about Moler's alleged remarks until a few weeks after his termination.   (Doc. 16-6, Rivera dep., at 38:22- 39:4.)   Rivera did not believe that Moler would say something like that. (*Id.*)

### J.  Allegations Regarding Other Employees

Del Castillo alleges that Moler, Sees, and Tianna Hanford missed scheduled shifts without notice but were not terminated.   (Doc. 16-16, Pl.'s Interrog. Resp. ¶ 2.)   Sees testified that she never no call, no showed.   (Doc. 16-9, Sees dep., at 50:24-51:1.)   Moler, Bundy, Kamaldeep

Kaur, and McCoy confirmed that they do not recall Sees missing a scheduled shift without notice. (Doc. 16-11, Moler dep., at 98:3-5.) Moler, Bundy, and Sees do not remember Hanford ever missing a scheduled shift without notice. (*Id.* at 98:9-12; Doc. 16-9, Sees dep., at 51:2-22; Doc. 16-13, Bundy dep., at 39:12-15.) Curtis and Kirandeep Kaur recall that anyone who no call, no showed was terminated. (Doc. 16-8, Curtis dep., at 62:3-18; Doc. 16-12, Kirandeep Kaur dep., 36:1-4.) Del Castillo claims, however, that at least one other Chipotle employee, who was African American, "no called/no showed" and was not terminated. (Doc. 20-2 at 56-57.)

Del Castillo alleges that Moler terminated Rivera because she is Mexican. (Doc. 16-3, del Castillo dep., at 164:10-16.) Rivera, however, has never claimed that she was terminated for that reason. (Doc. 16-6, Rivera dep., at 7:17-20.) Rivera testified that Moler terminated her employment because it seemed like she did not care about Chipotle. (*Id.* at 41:18-21.) Rivera agrees that she did not care about Chipotle and that not caring is a reasonable reason to be terminated. (*Id.* at 42:13-15; 44:12-14.) Finally, Rivera testified that Moler never did anything that made her think he had a racial bias against Mexicans. (*Id.* at 39:23-40:1.) To the contrary, Moler accommodated Rivera's request for time off to go to Columbus to obtain her Deferred Action for Childhood Arrivals immigration status. (*Id.* at 39:6-22.)

## II.   <u>LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S.

at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## III.  __ANALYSIS__

Plaintiff brings a single claim for discrimination based on his race under Title VII of the Civil Rights Act of 1964 and Ohio Revised Code, Ch. 4112. Title VII prohibits an employer from discriminating against any person with respect to the terms, conditions, or privileges of his employment based on race. 42 U.S.C. § 2000e-2(a)(1). To establish a discrimination claim under Title VII, the plaintiff must present either direct or circumstantial evidence of discrimination by an employer. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). Because del Castillo offers circumstantial evidence of discrimination by Chipotle, the Court must apply the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03 (1973). In evaluating discrimination claims under Chapter 4112, Ohio courts look to federal case law interpreting Title VII and also apply the *McDonnell Douglas* burden-shifting

framework. *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 991 (6th Cir. 2009).[2]

The first step of the *McDonnell Douglas* framework requires the plaintiff to establish a prima facie case of discrimination. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). To do so here, del Castillo must show that he (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or was treated differently from a similarly situated, non-protected employee.[3] *Presley v. Ohio Dep't of Rehab. & Correction*, 675 F. App'x 507, 512 (6th Cir. 2017) (citing *Baxter Healthcare*, 533 F.3d at 391). The Sixth Circuit has "held consistently that a plaintiff's burden of establishing a prima facie case is not an onerous one." *Wheat*, 785 F.3d at 237; *see also Kirkland v. James*, 657 F. App'x 580, 585 (6th Cir. 2016). If the plaintiff proves a prima facie case, then the employer has the burden to put forth a legitimate, nondiscriminatory reason for the employment action taken against the plaintiff. *Baxter Healthcare*, 533 F.3d at 391. If the employer provides such a reason, the burden shifts back to the plaintiff to show that the reason offered by the employer was pretext for unlawful discrimination. *Id*. at 391–92.

### A. Whether del Castillo Can Establish a Prima Facie Case

Chipotle argues that del Castillo cannot establish a prima facie case because he cannot

---

[2] Chipotle argued in its opening brief that del Castillo does not have direct evidence of discrimination. (Doc. 16 at 14.) Del Castillo neither addressed this argument nor argued that he could prove his case based on direct evidence. (Doc. 17.) The *McDonnell Douglas* framework therefore will be applied.

[3] Chipotle incorrectly states the elements of a prima facie case under *McDonnell Douglas*. (Doc. 16 at 15.) It correctly recites the first three elements, but then refers to the fourth element of a prima facie case under Michigan's Elliot-Larsen Civil Rights Act (ELCRA). (*Id.*, citing *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 501 (6th Cir. 2011).) In *Idemudia*, the plaintiff brought claims under Title VII and the ELCRA. The Sixth Circuit noted that the fourth element of a prima facie case under the ELCRA requires a plaintiff to show that he was "was discharged under circumstances that give rise to an inference of unlawful discrimination" – which is the element that Chipotle references in its brief. *Idemudia*, 434 F. App'x at 506 n.5 (quoting *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 914 (1998)). Although the Michigan Supreme Court held that the same *McDonnell Douglas* test applies to claims under the ELCRA, Chipotle's reliance on the ELCRA's language is a regrettable error. *Id.* Nevertheless, the Court has considered Chipotle's arguments as they apply to the proper standard, as set forth above.

show that he is Hispanic or that he was treated differently from a similarly situated, non-protected employee. (Doc. 16 at 15.) Chipotle does not contest del Castillo's qualifications for his position or that he suffered an adverse employment action.

Del Castillo has come forward with sufficient evidence to create a genuine issue of fact regarding his membership in a protected class. Del Castillo testified that he is one-half Hispanic. (Doc. 16-3, del Castillo dep., at 15:7-12.) The surname "del Castillo" is of Spanish origin. The evidence presented by Chipotle may cast doubt on this issue, but the Court must construe the facts in del Castillo's favor. The issue of del Castillo's racial identity might have been settled by deposing his father, from whom del Castillo claims to have inherited his Hispanic identity. The parties have not deposed del Castillo's father, however, and the evidence regarding his race is not dispositive. A reasonable juror who credits del Castillo's testimony could find that he is Hispanic.

As to the other challenged element of his prima facie case, del Castillo claims that he was treated differently from a similarly situated, non-protected employee—not that he was replaced by someone outside the protected class. *Presley*, 675 F. App'x at 512. Del Castillo's only argument in this regard is that his co-worker, "McCoy . . . identified individuals who violated the policy without termination, and also stated he knew there were others, even though he could not remember specifics." (Doc. 17 at 12, citing Doc. 20-2, McCoy dep., 55:19-57:22.) Vague, conclusory allegations of this kind are insufficient to withstand a motion for summary judgment. *Bradley v. Arwood*, 705 F. App'x 411, 430 (6th Cir. 2017); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir.1992) ("[R]umors, conclusory allegations and subjective beliefs ... are wholly insufficient evidence to establish a claim of discrimination as a matter of law.").

Reviewing the cited deposition transcript, however, McCoy testified that he knew of one other Chipotle employee, named Jushelem, who "no called/no showed" and was not terminated. (Doc. 20-2 at 56.) Jushelem is African-American, therefore he is also outside the relevant protected group. (*Id.* at 57.)

In its reply memorandum, Chipotle argues that McCoy "was not in a position to know the circumstances of an employee's attendance, an employee's notice, or management decisions related to that employee's attendance." (Doc. 18 at 8.) McCoy was a Chipotle employee, however, who could have observed when one of his co-workers, like Jushelem, no called/no showed for a shared shift. McCoy also could have observed that the co-worker was not fired, despite this violation of Chipotle's attendance policy. Chipotle did not object to McCoy's testimony for lack of foundation at his deposition. Del Castillo's counsel therefore did not ask McCoy to provide the basis for his knowledge of Jushelem's circumstances. It would be unjust to disregard McCoy's testimony based on Chipotle's belated objection, which del Castillo did not have any opportunity to address. Thus, construing the facts in the light most favorable to del Castillo, he has carried his burden of establishing a prima facie case.

**B.** **Whether del Castillo Can Establish Pretext**

As the legitimate, non-discriminatory reason for its action, Chipotle asserts that "Moler terminated del Castillo based on his belief that del Castillo missed scheduled shifts without proper notice." (Doc. 16 at 20.) The burden therefore shifts to del Castillo to show that Chipotle's proffered reason is pretext for unlawful discrimination. To meet this burden, del Castillo must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[ ] ... did not honestly believe in the proffered

nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001). Of course, at the summary judgment stage, a plaintiff "need only identify genuine disputes of fact regarding the legitimacy of the defendant's stated reasons." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). A plaintiff may establish pretext "by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action." *Kirkland v. James*, 657 F. App'x 580, 586 (6th Cir. 2016) (citing *See Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014)).

Del Castillo argues that several issues of fact preclude summary judgment. First, he asserts that it is undisputed that he called into work seven minutes before missing his 5:00 p.m. shift on August 25th. Therefore, he did not miss two shifts without providing notice—as Moler allegedly believed. (It bears repeating that Moler testified that he told employees to provide notice at least two hours before missing a shift; thus, even under del Castillo's version of events, he did not comply with that policy.) Del Castillo also claims that he told Moler that he was ill during his first shift on August 25th and that Moler also overheard his telephone conversation with Bundy before his second shift that day. Moler does not recall either of these events. Del Castillo also claims that he brought his doctor's note to his meeting with Moler and told Moler that he was sick—neither of which Moler recalls. Sees testified that del Castillo did tell Moler that he was sick at their final meeting. Del Castillo next argues that there is an issue of fact concerning the timing of Moler's discussion with other managers about del Castillo's termination. Del Castillo claims that he was terminated on the phone, after which Moler consulted the other managers. Chipotle claims that Moler spoke to del Castillo on the phone, consulted with the other managers,

and then terminated del Castillo in person during their meeting at the store.

Del Castillo also alleges that Moler discriminated against other Hispanic employees, namely Rivera (by terminating her) and Rodriguez (by not promoting him to Kitchen Manager). These allegations, however, are not corroborated by any other evidence. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992) (plaintiff's statements containing "nothing more than rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). Moler denies these allegations and Rivera herself testified that she was terminated because she did not care about Chipotle's success—not due to her race. As for Rodriguez, Moler testified that he was working to promote Rodriguez to Kitchen Manager, but Rodriguez quit after missing questions on a validation test.

Del Castillo counters that there is a discrepancy between Moler's testimony and Michael McGee's testimony regarding Rodriguez's failure to get a promotion. McGee was the Field Manager who administered Rodriguez's validation test. He testified that he was not responsible for Rodriguez's failure to be promoted. (Doc. 17-5 at 139:18-24.) Earlier in his deposition, however, McGee testified that the decision not to promote Rodriguez was Rodriguez's own: Rodriguez "realized, you know, he just wasn't ready to be a . . . manager at the time." (Doc. 17-5 at 59:8-15.) The difference between Moler's and McCoy's testimony does not support an inference of discrimination.

Del Castillo also claims that Moler made derogatory remarks about Hispanics—all of which Moler denies. According to del Castillo, Moler called Mexicans "dirty" and "bad at their work" and said "I fucking hate working with Mexicans." (Doc. 16-3, del Castillo dep., at 116:2-117:2; 117:8-18.) In addition, Moler allegedly made the following joke: "why can't you

play Uno with a Mexican? Because they take all the green cards." (*Id.* at 106:21-24.) Chipotle argues that del Castillo's testimony about these remarks amounts to nothing more than uncorroborated and self-serving allegations. Chipotle further argues that, even if del Castillo had evidence corroborating that the remarks were actually made, they should not be given significant weight under the stray remarks doctrine. (Doc. 16 at 19, citing *Ercegovich v Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355-56 (6th Cir. 1998).)

The stray remarks doctrine arose from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a case dealing with gender stereotyping and mixed-motive analyses in employment discrimination law. Congress later amended Title VII to eliminate a key holding in the case regarding evidentiary burdens in mixed-motives cases, but a portion of Justice Sandra Day O'Connor's concurrence grew into what is referred to as the stray remarks doctrine. In relevant part, Justice O'Connor wrote:

> Thus, stray remarks in the workplace, while perhaps probative of sexual harassment, [. . .] cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.

*Price Waterhouse*, 490 U.S. at 277 (internal citation omitted).

Five years after *Price Waterhouse*, the Sixth Circuit described the factors that it considers relevant to evaluating such stray remarks and statements: (1) "whether the comments were made by a decision maker or by an agent within the scope of his employment;" (2) "whether they were related to the decision-making process;" (3) "whether they were more than merely vague, ambiguous, or isolated remarks;" and (4) "whether they were proximate in time to the act of termination." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). In *Ercegovich*, the case relied on by Chipotle, the Sixth Circuit considered these factors in concluding

that the plaintiff presented a genuine issue of material fact as to whether the manager who made the offending remarks was involved in the decision to eliminate the plaintiff's position. *Ercegovich*, 154 F.3d at 354-55.

Applying these factors here, it is undisputed that Moler was a decision maker. He personally made the decision to terminate del Castillo's employment. The second factor asks whether Moler's remarks were "related to the decision-making process." Chipotle argues that they were not, but the Sixth Circuit has not construed this factor so narrowly. *See DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004).

In *DiCarlo*, the plaintiff claimed that his immediate supervisor called him a "dirty wop" [a slur referring to Italian-Americans] and complained that there were "too many 'dirty wops' working at the postal facility." *Id.* at 415-16. The Sixth Circuit concluded that "the fact that [these] comments were made by . . . [plaintiff's] immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced [plaintiff's] Italian-American heritage, and that the hate-speech occurred three weeks prior to [plaintiff's] termination, all culminate in the conclusion that [plaintiff] has presented sufficient evidence of causation to withstand summary judgment." *Id.* at 417.

As in *DiCarlo*, here the same manager who terminated del Castillo's employment is alleged to have made derogatory comments about his ethnicity before firing him. Even though the remarks in *DiCarlo* were not made contemporaneously with the adverse employment decision, they supported an inference that racial bias played a part in the plaintiff's termination. The Sixth Circuit plainly inferred a causal relationship between the supervisor's remark that there were too many Italian-Americans working at the post office and his termination of plaintiff, an

Italian-American, shortly thereafter. In this case, Moler allegedly said that he hated working with Mexicans and then terminated del Castillo, who claims to be Hispanic. Moler's alleged remarks share the same relationship to his decision-making process as the supervisor's comments in *DiCarlo*. It is also undisputed that Moler had discretion in deciding whether to fire an employee for failure to comply with the no call/no show policy. Hence, the decision-making process involved a degree of personal judgment by the very person alleged to have a discriminatory animus.

Turning to the third factor, Moler's alleged remarks were more than "merely vague, ambiguous, or isolated." *Cooley*, 25 F.3d at 1330. They were not vague, as they plainly evinced a bias against and desire not to work with Hispanics. Nor were they isolated. There were three separate comments about Hispanics and del Castillo also claims that Moler asked him on several occasions about his ethnicity. The combination of the derogatory remarks and Moler's alleged interest in del Castillo's ethnicity could support an inference that the remarks were not isolated events, but a reflection of an actual discriminatory bias.

The fourth factor regards the timing of the alleged remarks to del Castillo's termination. Del Castillo testified that Moler made the remark about hating to work with Mexicans—the remark most pertinent to the termination decision—a few months after Moler began working in the Huber Heights store, or approximately August 2014. (Ex. A, McGee Declaration, ¶ 16; Ex. 16-3 at 117:21-24.) Del Castillo was terminated in the same month, on August 26th. This temporal proximity further supports an inference that Moler's alleged bias affected his decision to terminate del Castillo's employment.

The combination of Moler's alleged remarks and the factual issues identified by del

Castillo is sufficient to withstand summary judgment as to pretext. If the trier of fact finds del Castillo credible regarding Moler's remarks, then they might also give greater weight to the alleged factual discrepancies relating to del Castillo's termination. Chipotle's argument that Moler's alleged remarks are not probative because they are uncorroborated is not consistent with the Sixth Circuit's treatment of similar remarks. In *DiCarlo*, there was no indication that anyone other than the plaintiff heard the supervisor's alleged ethnic slurs, but the Sixth Circuit nonetheless credited them pursuant to the "well-established rule on summary judgment that, when viewing the factual evidence, we must draw all reasonable inferences in favor of DiCarlo, the nonmoving party." *Dicarlo*, 358 f.3d at 416. Del Castillo's testimony that Moler made the remarks should also be contrasted against cases in which the plaintiffs provided only vague and conclusory allegations, not evidence, in support of their claims. *Cf. Mitchell*, 964 F.2d at 585.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Chipotle's Motion for Summary Judgment (Doc. 16).

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, March 21, 2018.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE